Anthony T. Caso (CA Bar No. 088561)
c/o Chapman Univ. Fowler Sch. of Law
One University Drive
Orange, CA 92806
Telephone:  (916) 601-1916
Facsimile: (916) 307-5164
tom@caso-law.com

David C. McDonald*
 (*pro hac vice* pending)
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
dmcdonald@mslegal.org

*Attorneys for Rayco, LLC*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYCO, a limited liability company<br>29461 Green Grass Court<br>Agoura Hills, CA 91301,<br><br>     Plaintiff,<br><br>       v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior<br>1849 C St., NW<br>Washington, DC 20240,<br><br>     Defendant. | No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff, Rayco, LLC ("Rayco"), by and through undersigned counsel, complains of Defendant, David Bernhardt, Secretary, United States Department of the Interior ("Secretary"), as follows:

## INTRODUCTION

1.     The Ray family has owned the Cima Cinder Mine for more than 70 years. First staked by Emerson Ray and his wife Fay in 1948, four generations of the Ray family have worked and grown up at the mine.  In 1991, the Rays applied for patents for the over 600 acres underlying their mining claims.  The next year the Department of the Interior ("DOI") acknowledged that the application process had been properly followed, accepted payment for the patents, and granted the Rays a certificate that conferred them with equitable title to the land while the government finished the geological and other technical analysis of whether patents should be issued.  More than 20 years passed and still the government did not complete its analysis.  Now, in responding to a lawsuit seeking a writ of mandamus to compel action on the patents, the government had denied patent for over 500 acres and granted patent for only 10 acres. DOI's denial of patents is based on legal and factual errors, is therefore inconsistent with the Administrative Procedure Act ("APA"), and should be vacated.

2.     First, DOI erred by holding that the Rays "relocated" their claims.  To be clear, the physical location of the claims has never changed.  Before filing their patent applications, however, the Rays amended the recorded legal descriptions of their claims, which had been estimated in 1948 based on late 1800's survey maps and rough measurements.  For example, one of the original legal descriptions indicated that a claim was located on "the SE1/4 of the NW1/4 and the SW1/4 of the NE1/4 and the NW1/4 of the SE1/4 and the NE1/4 of the SW1/4 of Section 15 T14N, R12E SBBM."  Later, once the Rays became aware that the legal descriptions contained errors, the Rays changed the recorded legal descriptions to match the claims' actual physical locations.  Amending the recorded legal description of a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

claim is a common and permitted practice, recognized in Bureau of Land Management ("BLM") regulations and elsewhere, and does not impact the effective date of the claim.  In other words, a miner's claim is not invalidated merely because the miner made a measurement or scrivener's error matching the physical location of the claim with labels on a map.  DOI, however, asserts that the Rays did not merely amend the descriptions of their claims, but completely "relocated" the claims.  In contrast to an amended location, a "relocation" changes the effective date of the claim, subjecting the claim to whatever factual or legal changes may have occurred since the original location.  DOI's argument in favor of "relocation" is merely the difference between the original legal description recorded in 1948 and the corrected legal descriptions recorded with the aid of 1990s technology and more accurate maps.  These changes, however, are consistent with amending a claim and do not support the BLM's more radical "relocation" conclusion, which is not in accordance with law.

3.     Moreover, determination of the effective date of a claim and the impact of changing a legal description relies on factual evidence much more rich and complex than mere comparisons of recorded legal descriptions.  In determining whether a claim has been amended and so continues, or has been relocated and so starts over, courts and agencies consider whether the physical activity on the ground or the physical staking has changed, the reason for the changed legal description, the intent of the person making the filing, and other surrounding circumstances.  DOI failed to consider all of these things when it held that the Rays relocated rather than amended their claims; thus, the DOI denial of patent fails to consider important aspects of the problem and entire categories of evidence and is arbitrary and capricious.

4.     Finally, contrary to DOI's assertion, none of Rayco's claims are precluded by the 1994 enactment of the California Desert Protection Act, 16 U.S.C.A. §§ 410aaa, *et seq.* (1994) ("CDPA").  The CDPA placed limitations on

mining and the issuance of patents in an area that encompasses the Cima Cinder Mine. As is common, however, the CDPA was subject to and preserved "valid existing rights" so that the Act would not create uncompensated takings. Rayco's mining claims and pending patent applications were such valid existing rights and were not diminished by the CDPA. DOI's misinterpretation of the CDPA is contrary to law and DOI's denial of certain mill site claims on that basis should therefore be vacated.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the General Mining Law of 1872, 30 U.S.C. § 21, *et seq.* ("the Mining Law"); and the Surface Resources Act of 1955, 30 U.S.C. § 601, *et seq.* ("SRA"); as well as regulations promulgated thereunder. Rayco seeks injunctive relief under federal law, namely under 5 U.S.C. §§ 555(b) and 704, of the APA.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because "a substantial part of the events or omissions giving rise to the claim occurred" within the district and "a substantial part of the property that is the subject of the action" is situated within the district.

## PARTIES AND THE CIMA CINDER MINE

7.     Rayco, LLC is a limited liability company, formed under the laws of and in good standing with the State of Nevada. Rayco is the owner of the Cima Cinder Mine. Rayco was formed in 1997 and is a wholly owned asset of the Emerson A. Ray and Fay R. Ray 1990 Trust ("Trust").

8.     The Cima Cinder Mine refers to three placer claims (known as "Iwo Jima," "Cinder 2," and "Cinder 3") and 51 mill site claims covering 692.5 acres of formerly BLM-managed land[1] in the Mojave Desert near Baker, California. The

---

[1] At the time the Trust filed the subject patent applications, and at the time equitable title to the patents vested in 1992, the land underlying the Cima Cinder Mine was managed by the BLM as

placer claims were originally located in 1948 (mill sites were located later, predominantly in 1991). All subject claims are located in Township 14N, Range 12E, San Bernardino Meridian, in San Bernardino County, California, Cima Mining District. The Cima Cinder Mine is located across three extinct volcanic cinder cones, from which Rayco and its predecessors in interest extracted red and black cinders for use in cinder blocks, landscaping, road de-icing, agricultural soil additives, and for various other industrial and aesthetic purposes. In 1992, production from the Cima Cinder Mine exceeded 400,000 tons of marketable cinder.

9. Defendant David Bernhardt is the Secretary of the United States Department of the Interior. This suit is brought against Mr. Bernhardt in his official capacity, as the Secretary of the Interior possesses ultimate responsibility to approve or deny mineral patent applications. BLM, the federal entity tasked with processing patent applications, is also organized within DOI, and its officials work under the direction of the Secretary.

## LEGAL BACKGROUND, FACTS, AND PROCEDURAL HISTORY

### A. Mining Laws and Regulations

10. The General Mining Law of 1872 declares that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, by citizens of the United States . . . ." 30 U.S.C. § 22. The Mining Law grants all citizens a statutory right to enter upon unappropriated lands for the purpose of exploring for and developing "valuable mineral deposits." *Id.* A person who makes a "discovery" of a "valuable mineral deposit" and satisfies the procedures for "locating" a claim becomes the owner of a valid mining claim. 30 U.S.C. §§ 22, 23, 26.

---

part of the East Mojave National Scenic Area. In 1994, Congress enacted the CDPA, creating the Mojave National Preserve and transferring management responsibility to the National Park Service.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

11.     The Surface Resources Act of 1955 removed common variety volcanic cinders, like the kind mined by Rayco at the Cima Cinder Mine, from those minerals subject to location under the Mining Law. 30 U.S.C. § 601.  Cinder deposits on federal land that were located after the enactment of the SRA cannot be claimed under the Mining Law and are only available to be leased from the federal government pursuant to the Materials Act of 1947. *Id.*

12.     The SRA, however, explicitly protects valid, pre-existing rights. Existing mining claims for volcanic cinder, located and shown to be marketable prior to the enactment of the SRA on July 23, 1955, were grandfathered in as valid mining claims fully open to patent.  30 U.S.C. § 615 ("Nothing in this Act shall be construed in any manner to limit or restrict or to authorize the limitation or restriction of any existing rights of any claimant under any valid mining claim heretofore located . . . .").

13.     There are three general types of mining claims: lode claims, placer claims, and mill site claims.  Lode claims "cover classic veins or lodes having well-defined boundaries," with a vein of gold running through solid quartz being the prototypical example.  Bureau of Land Management, *Mining Claims and Sites on Federal Lands* 7–8, https://www.blm.gov/or/programs/minerals/files/claims-pamphlet.pdf. Placer claims cover most other deposits not subject to lode claims, and are used when the mineral being extracted can be found relatively uniformly within a sand or gravel-type substrate. *Id.* at 8–10.  When one mines a placer claim, one is mining what is effectively the gravel on top of the bedrock. Mill site claims, in contrast, "must be located on non-mineral land" and can be claimed to provide space for milling operations or other mining-related activities, and are usually claimed in support of a primary lode or placer claim. *Id.* at 10–11.

14.     "Location" is the process by which a mining claimant memorializes his or her discovery of a valuable mineral deposit.  Location is governed by both federal and state law, and includes two elements: 1) creating physical monuments, and 2)

filing appropriate notice in the county land records office.  Physically, 30 U.S.C. § 28 states that a "location must be distinctly marked on the ground so that its boundaries can be readily traced," and "shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim."  Federal regulations expand upon these requirements, adding that a placer claim is physically located by 1) erecting a monument at the point of discovery with a notice including the claim name, the name and address of the locator(s), the date of location (the date on which the notice was posted), the acreage claimed, and a description of the claim (made by reference to one or more physical landmarks); and 2) then either physically marking the boundaries of the claim or providing a legal description using legal subdivisions (*i.e.*, township and range) when the land has been surveyed.  43 CFR § 3833.11(b).   These requirements are mirrored by California law. CA PUB RES § 3902.

15.    Within 90 days of physically locating a claim, the locator must record in the appropriate county recorder's office a notice or certificate of location that includes "a true copy of the notice [posted physically at the location] together with a statement by the locator . . . [which] shall include the section or sections, township, range, and meridian of the United States survey within which all, or any part, of the claim is located." CA PUB RES § 3911.  Since the enactment of the Federal Land Policy and Management Act ("FLPMA") in 1976, claimants have also had to record their locations with the relevant BLM state office, again within 90 days of posting.[2] 43 CFR § 3833.11(a).

16.    BLM regulations acknowledge the right of owners of unpatented mining claims to amend their notices or certificates of location to, *inter alia*, correct "omissions or other defects in the original notice or certificate of location," or to

[2] Owners of pre-existing mining claims were given until 1979 to comply with the new recordation requirements.

"correct the legal land description of the claim or site." 43 C.F.R. § 3833.21(a). A claim owner is not allowed to amend a notice or certificate of location to: "(1) [t]ransfer any interest or add owners; (2) [r]elocate or re-establish mining claims or sites [the claim owner] previously forfeited or BLM declared void for any reason; (3) [c]hange the type of claim or site; or (4) [e]nlarge the size of the mining claim or site." 43 C.F.R. § 3833.21(b).

17.    Claim owners are permitted to amend the legal description of their claim even after the land is closed to mineral entry if the claim owner is attempting to "correct or clarify defects or omissions in the original notice or certificate of location" or "correct the legal land description of the claim or site." 43 C.F.R. § 3833.21(c).

18.    For purposes of determining the date of location, "[a]n amended location notice or certificate relates back to the original location date." 43 C.F.R. § 3833.22(c).

19.    An "amended location" differs from a "relocation" in that an amended location merely corrects a defect in the original location and relates back to the date of that original location, while a relocation is the establishment of a new claim over land formerly encompassed by an existing claim that was either forfeited or declared void by the BLM, and legally functions as a new location subject to the laws in place at the time of relocation.  *See* 43 C.F.R. § 3833.21(a)–(b) (drawing distinction between relocation and amended location).

20.    If amending a certificate of location because of an error or omission in the original certificate, the error must be legally curable. Karen N. Owen, 176 IBLA 168, 171 (2008).

21.    An erroneous legal description is not one of the "[d]efects or other problems that cannot be cured" under BLM regulations. 43 C.F.R. § 3833.91.

22.    An erroneous legal description is not on the BLM's list of incurable statutory defects that will result in forfeiture (as opposed to those "regulatory"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

defects which may be cured, *see* 68 Fed. Reg. 61051–52 (Oct. 24, 2003)). 43 C.F.R. § 3830.91.

23.    A valid mining claim entitles the owner to an exclusive possessory interest in the subject federal land for mining purposes, with fee simple title to the land remaining in the United States.  The claim holder owns the mineral resources, but the United States retains the right to manage the surface, as long as such use does not "endanger or materially interfere" with mining operations. 30 U.S.C. § 612(b).

24.    Prior to 1994, owners of mining claims located on federal land could apply to "patent" their claims. Upon successfully completing the patent application process, fee simple title to the mineral estate would be transferred from the United States to the claim owner. That application process included, *inter alia*, the filing of "[a] plat, field notes, notices, and affidavits," and the publication of notice of the application in a local newspaper for 60 days. 30 U.S.C. § 29.

**B.    Congress's Moratorium on the Issuance of New Mineral Patents**

25.    In 1994, Congress passed the CDPA. The CDPA created the Mojave National Preserve and, *subject to valid existing rights*, withdrew the land within (which includes Cima Cinder Mine) from mineral entry. 16 U.S.C. § 410aaa-47. The CDPA included the proviso that "any patent issued after October 31, 1994, shall convey title only to the minerals, together with the right to use the surface of the lands for mining purposes, subject to [applicable] laws and regulations," again, subject to valid existing rights. *Id.* at aaa-48.

26.    On September 30, 1994, Congress enacted the Department of Interior and Related Agencies Appropriations Act, PL 103-302, 108 Stat. 2499, § 112 (1994) ("Moratorium Act"), which placed a moratorium on the expenditure of funds by DOI to process mineral patent applications submitted after that date. The moratorium remains in effect to this day.

27.    The Moratorium Act, however, included a grandfather clause, which states that the moratorium "shall not apply if the Secretary of the Interior determines

that, for the claim concerned: (1) a patent application was filed with the Secretary on or before September 30, 1994, and (2) all requirements established under [the relevant provisions of the Mining Law], were fully complied with by the applicant by that date." *Id.* at § 113.

28.     In 1996, in response to complaints over the substantial backlog of patent applications sitting untouched by DOI, Congress directed the Secretary to develop a plan detailing how DOI would make a final determination on "at least 90 percent of such applications within five years of the enactment of this Act" and "[t]ake such actions as may be necessary to carry out such plan." 110 Stat. 1321, § 322(c).

## C.     The Cima Cinder Mine

29.     Emerson Ray and his wife Fay (along with Emerson's brother and several other co-locators who transferred their interests to Emerson and Fay prior to 1955) first staked a claim on the Cima Cinder Mine in the Mojave Desert southwest of Las Vegas in 1948. The mine operated consistently for more than 50 years.

30.     The Cima Cinder Mine placer claims were located by hand, without the assistance of specialized surveying equipment.  Moreover, the location was made based upon the original surveys of the township in 1856 and 1857.

31.     The original certificates of location filed with the San Bernardino County Recorder's Office on June 29, 1948 (reflecting a June 1–2, 1948 location) provide the following legal descriptions of the claims: "the SE1/4 of the NW1/4 and the SW1/4 of the NE1/4 and the NW1/4 of the SE1/4 and the NE1/4 of the SW1/4 of Section 15 T14N, R12E SBBM" ("Iwo Jima"), "the SW1/4 of  Sec. 20 T14N R12E SBBM" ("Cinder 2"), and "E1/2 of the NW1/4 and the W1/2 of the NE1/4 of Sec. 29 T14N R12E SBBM" ("Cinder 3"). The certificates also describe the location of the claims as "[t]en miles south and one mile west of Valley Wells, Calif. (approximately)" for Iwo Jima, "11 miles south and 2 miles west of Valley Wells,

Calif. (approximately)" for Cinder 2, and "11½ miles south and 2 miles west of Valley Wells, Calif. (approximately)" for Cinder 3.

32.    Save for the erroneous legal descriptions, the information contained within the original certificates of location was true and correct.

33.    All three placer claims of the Cima Cinder Mine were validly located under the laws of the United States and the State of California.

34.    Production at the Cima Cinder Mine began no later than 1953. According to the mineral report prepared by BLM mineral examiner Robert Waiwood, some 56,000 tons of cinder were produced from the Cinder 2 claim in 1953 and 1954, with an additional 5,000 to 7,000 tons estimated to have been produced from the Iwo Jima claim "during the early 1950's."  The minerals were shown to be marketable prior to 1955.

35.    Several individuals and entities leased and operated the mine between 1953 and 1990, with ownership remaining with Emerson and Fay throughout the entire period. The Rays resumed direct control of the Cima Cinder Mine in 1990, and their daughter Lorene Caffee and her husband Terrance supervised operations until the mine's forced closure nine years later.

**D.    Rayco's Patent Applications**

36.    On September 4, 1991, in anticipation of applying for mineral patents, Rayco filed amended certificates of location for the Cinder 2, Cinder 3, and Iwo Jima placer claims to correct the erroneous legal descriptions included with the original certificates of location.

37.    On September 23, 1991, Rayco duly submitted to the BLM California State Office the information and documents required to apply for patents on the Cima Cinder Mine claims.[3]  BLM issued a First Half Final Certificate ("FHFC")[4] and

---

[3] Title to the Cima Cinder Mine, and therefore the Trust's interest in the subject patent applications, was transferred from the Trust to Rayco in 2001.

[4] Approval of a mineral patent application occurs in two stages: the issuance of FHFC indicates that the applicant has successfully completed their application and, pending confirmation of the

accepted purchase money for the patents on May 7, 1992, conveying equitable title and recognizing that Rayco had complied with all application, posting, and publication requirements necessary for application for mineral patents.

38.     BLM began work on a mineral examination and report in 1992. A mineral report was completed and signed by Certified Mineral Examiner Robert Waiwood, Senior Technical Minerals Specialist James R. Evans, and Superintendent of the Mojave Natural Preserve Mary Martin, not later than June 18, 1999.

39.     Despite numerous inquiries from Rayco, BLM never completed the processing of Rayco's patent applications nor informed Rayco as to the reason for the delay.

**E.   Mandamus Suit, Partial Patent, and Current Administrative Proceedings**

40.     On April 10, 2019, fed up with a 27-year delay in the processing of its patent applications, Rayco filed a petition for writ of mandamus seeking an order requiring DOI to issue a final determination on the patent applications.

41.     The parties reached a settlement on September 16, 2019, whereby DOI agreed to issue a final decision on the patent applications.

42.     On July 16, 2020, DOI issued its final determination on Rayco's patent applications, holding all but 10 acres of the Cinder 2 claim to be invalid as post-1955 relocations of the claims staked in 1948. DOI also declared all but 22.5 acres of the mill sites invalid for not being based on a valid mineral location ("Challenged Decision").[5]

---

validity of the mining claim by the BLM, is presumptively entitled to a patent; Second Half Final Certificate ("SHFC") is issued following completion of the mineral examination and secretarial approval.

[5] While DOI's denial of patent to the placer claims was signed by Principal Deputy Assistant Secretary for Minerals Management Casey Hammond and is a final agency action for purposes of judicial review, the denial of the mill sites (and subsequent amendments) was styled as a contest complaint, signed by BLM California State Office officials, and subject to agency review. Rayco filed its answer on August 15, 2020. The case has been assigned numbers CACA 28826 and CACA 28827 and is currently awaiting assignment to an administrative law judge. Rayco has sought a

43.     DOI did grant SHFC and patent to 10 acres of Cinder 2, but held the associated mill sites to be invalid under the CDPA.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
(5 U.S.C. § 706 – Administrative Procedure Act)
(Arbitrary and Capricious)

44.     Rayco incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

45.     The APA requires federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

46.     Under the "arbitrary and capricious" standard, a reviewing court must analyze both the factual basis for an agency's action, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), as well as the reasoning employed by the agency. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

47.     In general, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

---

stay in these administrative proceedings pending the outcome of the present litigation, as the BLM's contest is premised principally on the assertion that Rayco's placer claims are mostly void, the very matter currently under contention in this court.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

48.     In making determinations as to the validity of a given location, both the courts and the Interior Board of Land Appeals ("IBLA") regularly give priority to sources of evidence other than the filed certificates of location.  *See Skaw v. U.S.*, 13 Cl. Ct. 7, 39 (1987) ("The intent of the locators, when apparent from the notices and the markings on the ground, controls the description of the claims.") (citing *Sturtevant v. Vogel,* 167 F. 448, 452 (9th Cir. 1909)); *California Dolomite Co. v. Standridge*, 275 P.2d 823, 825 (Cal. Dist. Ct. App. 1954) ("The mere recording and filing of [a certificate of location and proofs of labor] without regard to what was done on the ground could not be conclusive . . . . Assuming that such recording and filing would be sufficient to make out a prima facie case, this may well be overcome by evidence of the factual situation and what was actually done."); Jim Collins, 175 IBLA 389, 392 (2008) (setting aside decision that mining claim was void *ab initio*, in part, because BLM failed to engage in further examination of facts on the ground, which indicated the claim was potentially valid under a different regulatory provision). *C.f. Houck v. Jose*, 72 F. Supp. 6, 8 (Dist. Ct. S.D. Cal. 1947) (refusing to accept a later-filed document as evidence of valid location over other, more probative evidence, in dispute with competing claimant).

49.     This requirement to look beyond the legal description in the certificate of location when determining the validity of a mineral location is reinforced in the context of an amended location by the plain language of the BLM's own regulations, which clearly both provide for "correcting the legal land description of the claim or site" as a valid purpose for amending a mineral location, 43 C.F.R. § 3833.21(a), and acknowledge that such amendment can occur even when the land has, since the time of original location, been withdrawn from mineral entry.  43 C.F.R. § 3833.21(c).

50.     The Challenged Decision declaring all but 10 acres of the Cima Cinder Mine placer claims void *ab initio* is arbitrary and capricious because DOI entirely failed to consider an important aspect of determining the validity of a mineral

location. DOI, in determining that the 1979 and 1991 amended locations were actually relocations that do not relate back to the original date of location in 1948, relied solely on the differences between the original legal descriptions of the claims and the amended legal descriptions of the claims.  Since the legal descriptions overlap only on 10 acres, DOI summarily concluded that there was sufficient evidence to declare the claims for the remaining acreage void as attempting to take in new ground. This approach ignores substantial evidence that the physical location of the Cima Cinder Mine placer claims has not changed since prior to 1955.  The agency's decision also ignores that BLM's own regulations explicitly describe the correction of an erroneous legal description as a legitimate justification for amending a notice or certificate of location.  43 C.F.R. § 3833.21(c).

51.   Prior to the development of modern surveying equipment and the availability of high-quality, detailed maps—none of which Emerson had at his disposal in 1948 in the remote and inhospitable Mojave Desert—it was almost expected that certificates of location would contain errors that would need to be corrected. *McEvoy v. Hyman*, 25 F. 596, 600 (Cir. Ct. D. Colo. 1885) ("Every one who is at all familiar with mining locations knows that, in practice, the first record must usually, if not always, be imperfect.  Recognizing these difficulties, it has never been the policy of the law to avoid a location for defects in the record, but rather to give the locator an opportunity to correct his record whenever defects may be found in it.").

52.   Ample additional evidence of the historical physical location of Rayco's claims was freely available to DOI, which either failed to review this evidence or chose to disregard it.  Its failure to engage with this evidence indicates that DOI entirely failed to address an important part of the problem at issue.

53.   Further, the Mining Law provides that the miners of each mining district are permitted to make their own regulations "governing the location, manner of recording, [and] amount of work necessary to hold possession of a mining claim,"

provided such regulations do not conflict with federal or state law. 30 U.S.C. § 28. By failing to make any investigation into evidence customarily considered when determining location validity issues, as evidenced by, *inter alia*, the decisions cited in Paragraph 54, *supra*, DOI has failed to consider an important aspect of the problem before it.

54. The Challenged Decision is also arbitrary and capricious because it runs counter to the evidence before the DOI at the time. DOI made the determination that the amendments to the certificates of location were not valid amendments to correct errors in the original certificates based solely on a conclusion from the 2020 supplemental mineral report that the amended legal descriptions differ substantially from the original legal descriptions. The administrative record in this case will show that the overwhelming weight of the evidence available to the DOI indicates that the actual, physical location of the Cima Cinder Mine placer claims has remained unchanged since 1948, and that subsequent amendments to the certificates of location were merely attempting to conform the legal descriptions to the reality on the ground.

55. Because the DOI entirely failed to consider important aspects of the problem and issued a decision contrary to the weight of the evidence before it, the Challenged Decision should be set aside as arbitrary and capricious.

## SECOND CLAIM FOR RELIEF
### (5 U.S.C. § 706 – Administrative Procedure Act)
### (Not in Accordance with Law)

56. Rayco incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

57. The APA requires federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2).

58.     The APA also mandates that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* Questions of law, in contrast to questions of fact, are not analyzed under the arbitrary and capricious standard, and are "freely reviewable by the courts." *U.S. v. Dahan*, 369 F.Supp. 2d 1187, 1191 (C.D. Cal. 2005).

59.     DOI's treatment of Rayco's amended certificates of location as, in effect, relocations that do not relate back to the date of original location is directly contradicted by the clear language of 43 C.F.R. § 3833.21 and 43 C.F.R. § 3833.22.

60.     DOI's reasoning that the withdrawal of common variety cinders from location under the Mining Law in 1955 automatically invalidates any post-1955 attempt to correct the erroneous legal descriptions in the original certificates of location ignores that 43 C.F.R. § 3833.21 explicitly provides for the amendment of a certificate of location to "correct the legal land description of the claim or site," even following the withdrawal of the land to mineral entry.

61.     DOI's reasoning disregards that BLM regulations describe errors or defects with certificates of location that cannot be cured and result in forfeiture of claims in two separate places, 43 C.F.R. § 3830.91; 43 C.F.R. § 3833.91, and that the regulations contain no hint that an erroneous legal description cannot be cured.

62.     DOI's reasoning also ignores the regulations' clear focus on preventing the *intentional* and bad faith attempts of mining claimants to claim additional land without going through the trouble of physically locating a new claim—not the adjustment of legal descriptions to more closely conform to the actual location of the monumented claims on the ground. *See Tonapah & Salt Lake Mining Co. v. Tonapah Mining Co. of Nevada*, 125 F. 389, 399–400 (Cir. Ct. D. Nev. 1903) (emphasizing the intent of the claimant and stating, "[t]he question of good faith is an important consideration, because that is the real basis of the rule which all the

courts, as we observe them, have adopted in construing these mining statutes—liberality of construction.") (quotation omitted).

63.     This focus on intent is borne out in the text of BLM's regulations as well. 43 C.F.R. § 3833.21(b) mandates that a claimant may not amend their notice or certificate of location "to . . . [e]nlarge the size of a mining claim or site."  The regulation does not prohibit any amendment that takes originally physically staked acreage not encompassed within the original certificate's legal description, but rather prohibits a claimant from amending their certificate of location *for the purpose of* enlarging their claim to encompass land not originally physically located.

64.     When Rayco amended its certificate of locations, it did not enlarge the size of the claims or attempt to take advantage of a new, post-1955 discovery.  In fact, the acreage claimed for Iwo Jima was actually reduced from 160 acres to 120 acres in the amended legal description.

65.     To the extent courts defer to federal agencies' reasonable interpretations of their own ambiguous regulations, no such deference is appropriate when the meaning of the regulation is clear and unambiguous on its face. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019).

66.     DOI also entirely disregarded the provisions of Section 38 of the General Mining Law, which provides:

> Where [mining claimants] have held and worked their claims for a period equal to the time prescribed by the statute of limitations for mining claims of the State or Territory where the same may be situated, evidence of such possession and working of the claims for such period shall be sufficient to establish a right to a patent . . . .

30 U.S.C. § 38. Proper recordation is not necessarily required to establish a valid location if the requirements of Section 38 are satisfied.

67.     The statute of limitations under California state law is five years. CA C. Civ. Pro. § 325; *U.S. v. Haskins*, 505 F.2d 246, 250 (9th Cir. 1974).

68.     Even if one assumes the SRA prohibits post-1955 amendments of pre-1955 claims to the extent the amended legal descriptions do not overlap with the original legal descriptions, Rayco's predecessors had held and worked the Cima Cinder Mine claims—at their present location and as described in the amended certificates of location—for more than five years at the time the SRA was enacted.

69.     Rayco's predecessors were openly conducting exploration and mining operations on the three cinder cones encompassed within the amended legal descriptions no later than September 1948.

70.     No other person or association located a claim on any of the land encompassed within the amended legal descriptions between 1948 and 1955.[6]

71.     Regardless of the legal descriptions provided in the original certificates of location, Rayco's predecessors held and worked the Cima Cinder Mine in the physical location described in the amended certificates of location for more than five years prior to the SRA, satisfying 30 U.S.C. § 38's requirements to establish a valid, patentable location.  The placer claims constituted valid mineral locations before the enactment of the SRA in 1955, making the claims patentable.

72.     DOI's misinterpretation of the clear, unambiguous language of its own regulations renders the Challenged Decision not in accordance with law, and this Court should set it aside.

## THIRD CLAIM FOR RELIEF
### (5 U.S.C. § 706 – Administrative Procedure Act)
### (Not in Accordance with Law – Six Mill Sites Denied Pursuant to CDPA)

73.     Rayco incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

---

[6] The Ray family was forced to defend a Quiet Title Action filed by an individual attempting to "jump" some of the Cima Cinder Mine claims in the mid-1950s, but the lawsuit was dismissed for failure to appear in 1956.

74.    The APA requires federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2).

75.    The APA also mandates that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* Questions of law, in contrast to questions of fact, are not analyzed under the arbitrary and capricious standard, and are "freely reviewable by the courts." *U.S. v. Dahan*, 369 F.Supp. 2d at 1191.

76.    DOI's denial of patent and cancellation of first half final certificate for the six mill sites (or portions thereof) associated with the 10 acres of the Cinder 2 placer claim granted patent is based on an erroneous interpretation of the CDPA and is therefore not in accordance with law.[7]

77.    DOI denied the mill sites by invoking the language of Section 508 of the CDPA, which reads:

> *Subject to valid existing rights*, all mining claims located within the preserve shall be subject to all applicable laws and regulations applicable to mining within units of the National Park System, including section 1865(b) of Title 18 and subchapter III of chapter 1007 of Title 54, and any patent issued after the date of enactment of this title shall convey title only to the minerals together with the right to use the surface of lands for mining purposes, subject to such laws and regulations.

---

[7] This Complaint challenges only those decisions made under the authority of the Secretary and constituting final agency action reviewable under Section 706 of the APA.  The invalidation of the remaining applied-for mill sites is currently being administratively challenged by Rayco within the Office of Hearings and Appeals.  Rayco does not waive any argument based on the invalidation of those mill sites not associated with the 10 granted acres, and reserves the right to amend this Complaint to add such claims when appropriate.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

16 U.S.C. § 410aaa-48 (emphasis added).

78.     Section 508 of the CDPA, as is common in many statutes, protects valid, pre-existing rights, including mill site or non-mined claims, to protect against uncompensated takings. The plain text and standard rules of statutory construction indicate that this protection against takings extends to the entire Section—including that portion prohibiting the patenting of lands that are non-mineral in character.

79.     DOI, however, denied the mill site claims by reading the "subject to valid existing rights" exclusion out of the second clause of the sentence.

80.     DOI's interpretation is inconsistent with the plain text of Section 508—a single sentence which begins with the phrase "[s]ubject to valid existing rights" and containing no qualifying language indicating that phrase should not apply to the entire sentence. DOI's interpretation also violates the series-qualifier canon of statutory construction. *See Paroline v. United States*, 572 U.S. 434, 447 (2014) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.") (quoting *Porto Rico Ry., Light & Power Co. v. Mor.*, 253 U.S. 345, 348 (1920)); *United States v. Bass*, 404 U.S. 336, 339-40 (1971) ("When a modifier applies to at least one clause, and it makes sense applying to all clauses within the statute, the more plausible construction is that it applies to all of the clauses.").

81.     DOI's misinterpretation of the CDPA renders the Challenged Decision not in accordance with law, and this Court should set it aside.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.     Hold unlawful and set aside the Department of the Interior's denial of mineral patent and cancellation of first half final certificate for all but 10 acres of the Iwo Jima, Cinder 2, and Cinder 3 mining claims (CACA 28826 and CACA 28827);

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

2.      Hold unlawful and set aside the Department of the Interior's denial of mineral patent and cancellation of first half final certificate for the six mill sites (or portions thereof) associated with the 10 acres of the Cinder 2 placer claim granted patent;

3.      Remand Patent Applications CACA 28826 and CACA 28827 to the Department of the Interior for immediate reconsideration consistent with this Order;

4.      Award Plaintiff reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, *amended by* Pub. L. No. 116-9, 133 Stat. 580 (2019); and

5.      Grant such other and further relief as this Court deems appropriate and just under the circumstances.

DATED this 19th day of January, 2021.

Respectfully submitted,

*s/ Anthony T. Caso*
Anthony T. Caso (CA Bar No. 088561)
c/o Chapman Univ. Fowler Sch. of Law
One University Drive
Orange, CA 92806
Telephone:  (916) 601-1916
Facsimile: (916) 307-5164
tom@caso-law.com

David C. McDonald*
(*pro hac vice* pending)
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
dmcdonald@mslegal.org

*Attorneys for Rayco, LLC*